IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| CONTONIUS GILL, | ) ) ) | |
| Intervenor-Plaintiff, | ) ) ) | |
| v. | ) ) | 1:11CV498 |
| A.C. WIDENHOUSE, INC., | ) ) ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a partial Motion for Summary Judgment [Doc. #24] filed by Defendant A.C. Widenhouse, Inc. ("Widenhouse" or "Defendant") in this employment discrimination action. In this case, the Plaintiff U.S. Equal Employment Opportunity Commission ("Plaintiff EEOC") has asserted a single claim pursuant to Title VII of the Civil Rights Acts of 1964 and Title I of the Civil Rights Act of 1991, alleging that Defendant discriminated on the basis of race by subjecting employees to a racially hostile work environment. Intervenor-Plaintiff Contonius Gill ("Plaintiff Gill") filed a Complaint in Intervention, asserting claims against Defendant for (1) violation of Title VII based on a racially hostile work environment, racially discriminatory discharge, and retaliatory discharge; (2) discrimination on the basis of race in violation of 42 U.S.C. § 1981; and (3) wrongful discharge

in violation of state public policy.[1]  In the present Motion for Partial Summary Judgment, Defendant seeks judgment in its favor on the claims asserted by Plaintiff Gill related to his discharge, but Defendant does not seek to dismiss the hostile work environment claim asserted by Plaintiff EEOC.  Defendant Widenhouse has also filed a Motion to Strike [Doc. #27], seeking to strike portions of Plaintiff Gill's summary judgment evidence.  For the reasons set out below, the Court will grant Defendant's Motion to Strike and will recommend that Defendant's Motion for Summary Judgment be granted in part and denied in part, and that this action proceed to trial on Plaintiff Gill's claims alleging racially hostile work environment, discriminatory discharge, and retaliatory discharge in violation of federal law, and on Plaintiff EEOC's claim alleging hostile work environment in violation of Title VII and Title I.

I.    FACTUAL BACKGROUND

Widenhouse is located in Concord, N.C., and is engaged in the business of hauling asphalt and other material.  (Gill Dep. at 72-85 [Doc. #26-7 at 3-16].)  Plaintiff Gill was employed as a truck (tanker) driver hauling molten asphalt in the area surrounding the company's Concord base of operations (Old Charlotte Road facility) from May 2007 until June 2008.  (Id.)  Plaintiff was hired by the company's terminal manager, Mr. Buddy Waller ("Manager Waller"), whose office was located in the Old Charlotte Road facility.  (Id.)  Plaintiff was supervised by Manager Waller and worked directly with the company dispatcher, Ms. Kim

---

[1] Plaintiff Gill also originally asserted a claim alleging disparate treatment based on race, but he has voluntarily dismissed that claim [Doc. #20].

Griffin ("Dispatcher Griffin"), who also occupied an office at the Old Charlotte Road facility. (Id.)

Plaintiff testified at his deposition that he was subjected to racial harassment throughout the time that he was employed at Widenhouse. He testified that Manager Waller, Dispatcher Griffin, and several of his co-workers frequently used the terms "nigger," "coon," "tar baby," "monkey," "Tyrone," and "lawn jockeys" in his presence to refer to African Americans. (Gill Dep. at 170-86 [Doc. #26-7 at 45-61].) Manager Waller, Dispatcher Griffin, and the co-workers who allegedly used these terms are all Caucasian. Specifically with respect to Manager Waller, Plaintiff Gill contends that Manager Waller would often ask Plaintiff Gill if he was going to vote for "Obammy," meaning President Obama, and that Manager Waller told him that "if one of his daughters brought home a black man," he would "kill them both." (Id. at 184, 194-95 [Doc. #26-7 at 59, 69-70].) Plaintiff testified that he complained to Manager Waller about his use of the "N-word," and Manager Waller would "say okay" or smile but never stopped using the word. (Id.) Plaintiff recalled complaining to Manager Waller approximately 25 times about racial terms being used at Widenhouse, and also complained to Manager Waller when he saw a noose hanging in the Widenhouse shop. (Id. at 196-99 [Doc. #26-7 at 71-74].)

In addition to his own testimony regarding Manager Wallace, Plaintiff presented testimony of his co-workers. One co-worker, Carl Hewitt, testified at deposition that he heard Manager Waller use the term "nigger" toward Defendant Widenhouse a few times, and that he recalled Manager Waller telling a joke which included the term "nigger." (Hewitt Dep. at 30-31, 36 [Doc. #26-10 at 3-4, 9].) He further testified that he had seen a "Son of the South" business

card, displaying a confederate flag, on Manager Waller's desk. (Id. at 46-47 [Doc. #26-10 at 19-20].) Mr. Hewitt stated that Manager Waller was "very racist." (Id. at 53 [Doc. #26-10 at 24].)

Mr. Robert Floyd, an African American driver for Widenhouse, testified at deposition that a phrase often used in Defendant's offices was "family tree," which referred to a place on the Widenhouse property "where they would hang the Black people." (Floyd Dep. at 95 [Doc. #26-11 at 18].) Mr. Floyd testified that he had seen a noose placed in the back of Manager Waller's truck, and he had seen a noose hanging from one of the rafters in Defendant's shop. (Id. at 101, 105-07 [Doc. #26-11 at 24, 28-30].) Mr. Floyd further testified that on one occasion, he had an argument with Manager Waller, and Manager Waller made a reference to finding a noose with Mr. Floyd's name on it. Mr. Floyd said that Manager Waller referred to "friends visit[ing] during the middle of the night," which Mr. Floyd took as a reference to the Ku Klux Klan. (Id. at 134-36 [Doc. #26-11 at 52-54].) Mr. Floyd had also seen the "Son of the South" card with the confederate flag on it upon Manager Waller's desk. (Id. at 148 [Doc. #26-11 at 66].) He associated the card with the KKK. (Id. at 155-56 [Doc. #26-11 at 73-74].) Mr. Floyd testified at that he complained to Owner Barbour about Manager Waller's racist comments, but Owner Barbour told him to "just let it go." (Floyd Dep. at 30-31, 39 [Doc. #26-11 at 3-4, 12].) According to Mr. Floyd, Owner Barbour told him that he hired Manager Waller to be his terminal or general operations manager and that Owner Barbour "backed" Manager Waller "100 percent." (Id. at 111 [Doc. #26-11 at 34].)

In addition to the alleged harassment by Manager Waller, Plaintiff also testified regarding racial harassment by a Widenhouse mechanic, Brian Christy ("Mechanic Christy"). Plaintiff

-4-

testified that Mechanic Christy presented a noose to him on more than one occasion and once told him that the noose was for him and asked Plaintiff if he wanted to "hang from our family tree." (Gill Dep. at 192 [Doc. #26-7 at 67].) Plaintiff testified that Mr. Christy frequently made comments such as "Look at that tar baby," "We don't have a colored bathroom," and "We're out of black paint, can we borrow some off you?" (Id. at 193 [Doc. #26-7 at 68].) In addition, Plaintiff presented testimony that another driver named Bud would use terms such as "nigger, porch monkey, coon" more or less every day while at work, often in Manager Waller's presence, that Bud would talk about black people "constantly" and tell racial jokes on the CB radio used by the drivers, and that there was a hangman's noose in the truck driven by Bud. (Hewitt Dep. at 32-33, 39-41, 44-45 [Doc. #26-10 at 5-6, 12-14, 17-18].)

Plaintiff's employment was terminated on June 9, 2008. Plaintiff testified at deposition that on June 9, 2008, he was at Blythe Construction where he was picking up loads of molten asphalt when he "got a little ill." (Gill Dep. at 106 [Doc. #26-7 at 18].) He testified that he "slipped off the side of the tanker" and attempted to call Dispatcher Griffin on his Nextel phone to report his illness. (Id.) He further testified that after unsuccessfully trying to reach her for 30 to 45 minutes, he returned to the Old Charlotte Road facility. (Id.) On his way there, Plaintiff Gill stated that he had to pull his truck over one time because he "was really dizzy, really dizzy," and almost vomited. (Id.)[2] Plaintiff testified that he arrived at the Old Charlotte Road facility and was pumping gas into his truck when he heard Dispatcher Griffin yelling at him on

---

[2] Plaintiff's co-worker, Mr. Floyd, confirmed that when hauling asphalt the fumes given off from the tanker were very strong and capable of making one nauseous. (Floyd Dep. at 160 [Doc. #26-11 at 78].)

the Nextel and asking him, "What the hell are you doing here?" (Id.) He testified that he also heard her say that he had better "get [his] ass back over to Blythe." (Id. at 109 [Doc. #26-7 at 21].) He said that he did not respond by Nextel, and intended to go across the street to the office and talk to Dispatcher Griffin, when he saw her come out of the office and leave in her car. (Id. at 107 [Doc. # 26-7 at 19].) Plaintiff testified that he attempted unsuccessfully to talk to Dispatcher Griffin again on the Nextel, but she did not respond. (Id. at 110 [Doc. #26-7 at 22].)

Plaintiff testified that a few minutes later, he heard Manager Waller, who was with Owner Barbour, on the Nextel. (Id.) Plaintiff stated that he talked to Manager Waller for a minute or so and their conversation ended when Manager Waller told Plaintiff that he was "tired of some shit, my shit or something, and clean out the truck" and for Plaintiff to leave his "stuff with Brian." (Id. at 113 [Doc. #26-7 at 25].) Plaintiff further testified that Manager Waller may have told him to go back to Blythe Construction to run some loads, and that he responded by telling Manager Waller that he was not feeling well. (Id.) Plaintiff said that "at no time did [he] talk to Owner Barbour," although he assumed that the voice he heard in the background while talking to Manager Waller was Owner Barbour. (Id. at 115 [Doc. #26-7 at 27].) Plaintiff testified that he took Manager Waller's comment to "clean out" his truck to mean that he was fired. (Id.)

Plaintiff testified that he left the facility and went to the doctor that same day. (Id. at 116 [Doc. #26-7 at 28].) He stated that he was given breathing treatments and "steroidal medication." (Id.) The doctor wrote Plaintiff a note stating that Plaintiff could return to work on the 11th of June. (Id.) Plaintiff said that he returned to the Old Charlotte Road office on

-6-

the 11th but that Dispatcher Griffin would not accept his note. (Id. at 117 [Doc. #26-7 at 29].) According to Plaintiff, Dispatcher Griffen told Plaintiff to give it to Manager Waller, but Manager Waller was not at the office and refused to speak to Plaintiff by phone. (Id.)

The record reveals at least two other versions of the above events on June 9, 2008. Dispatcher Kim Griffin testified that, to her recollection, Manager Waller and Plaintiff met in person in the office at the Old Charlotte Road facility on June 9. (Griffin Dep. at 155-57 [Doc. #26-12 at 11-12].) According to her, Plaintiff told Manager Waller that he did not feel well and was not going to finish his runs. (Id.) According to Dispatcher Griffin, Owner Barbour was not present, and Manager Waller told Plaintiff that he needed to go back and finish his runs, but Plaintiff said that he was not going back. (Id. at 158-59 [Doc. #26-12 at 13-14].) Dispatcher Griffin testified that after 15 or 20 minutes of hearing them arguing, she left the office for lunch, and when she returned to the office, Manager Waller told her that he "had to let Mr. Gill go." (Id. at 161, 165 [Doc. #26-12 at 16, 20].)

For his part, Manager Waller testified at deposition that on June 9, he was riding with Owner Barbour close to Hickory, N.C., when Dispatcher Griffin called him on his Nextel and told him that Plaintiff Gill refused to haul a load to Blythe Construction and that she "had to have it to Blythe." (Waller Dep. at 217 [Doc. #26-8 at 19].) Manager Waller contends that he called Plaintiff Gill to see what the problem was, and Plaintiff Gill said that it was too hot and that he did not want to work. (Id. at 219 [Doc. #26-8 at 21].) According to Manager Waller, Plaintiff Gill did not say that he was feeling sick or dizzy. (Id.) Manager Waller further testified that he gave the Nextel to Owner Barbour, who offered Plaintiff Gill an extra $25 to haul the

-7-

load, but that Plaintiff Gill still refused. (Id. at 224 [Doc. #26-8 at 26].) Manager Waller testified that "Owner Barbour is the one that let [Plaintiff Gill] go." (Id.) Manager Waller testified that when he returned to Concord, Plaintiff Gill was not at the office, and he had no further conversation with Plaintiff Gill. (Id. at 225 [Doc. # 26-8 at 27].)

Owner Barbour similarly testified at his deposition that on June 9, he and Manager Waller were riding together when Dispatcher Griffin called Manager Waller on his Nextel to inform him that Plaintiff Gill refused to take the load. (Barbour Dep. at 102 [Doc. #26-6 at 27].) Mr. Barbour said that he talked to Plaintiff Gill by Nextel, offered him $25 extra to take the load to Blythe Construction, and told Plaintiff Gill that "if he did not take the load I was going to interpret that as he was quitting." (Id.) Owner Barbour contends that Plaintiff Gill did not mention that he was feeling sick, and only complained that it was too hot. (Id. at 106-08 [Doc. #26-6 at 31-33].) Owner Barbour testified that he told Plaintiff Gill to turn in his uniforms and Nextel if he did not haul the loads. (Id. at 109 [Doc. #26-6 at 34].) According to Owner Barbour, Plaintiff Gill responded, "okay," and Owner Barbour said that with that response he expected Plaintiff to haul the loads. (Id.) Owner Barbour contends that he based his decision to terminate Plaintiff Gill solely on his refusal to haul the load. (Id. at 115 [Doc. #26-6 at 40].)

Plaintiff Gill filed his Charge of Discrimination with the EEOC on August 19, 2008. (Charge [Doc. #25-3] at 2.) He claimed race discrimination and retaliation by being discharged for complaining about racial harassment. (Id.)[3] After the EEOC filed the present suit alleging

---

[3] In addition, on August 10, 2008, Plaintiff filed an Employment Discrimination Complaint with the North Carolina Department of Labor. In the Department of Labor Complaint Questionnaire, Plaintiff alleged that he became sick at work on June 9 while driving a truck with faulty air conditioning and loading molten

discrimination based on a racially hostile work environment, Plaintiff intervened, adding his claims for discriminatory and retaliatory discharge. In the present Motion for Summary Judgment, Defendant seeks dismissal of the claims related to Plaintiff's discharge, contending that Plaintiff has failed to present sufficient evidence in support of his claims.

II. DISCUSSION

    A. Summary Judgment Standard

Summary judgment is appropriate only when no genuine issue of material fact exists. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." (Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).)

Title VII prohibits an employer from discharging an individual or otherwise discriminating against him with respect to compensation, terms, conditions, or privileges of

---

asphalt, that he informed Dispatcher Griffin and Manager Waller of the illness, and that he was fired on June 9 when he complained of his illness.

employment, because of that person's race. 42 U.S.C. § 2000e-2(a)(1). If a plaintiff has no direct evidence of discrimination, he may use the burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Under that framework, if the plaintiff establishes a prima facie case of discrimination, the burden of going forward shifts to the employer who must articulate a legitimate, non-discriminatory reason for the alleged discriminatory act. Burdine, 450 U.S. at 253. Should the employer carry this burden, the plaintiff has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. Id. see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). The ultimate burden of proving discrimination remains at all times with the plaintiff. Id.[4]

---

[4] The Court notes that Plaintiff has asserted the same claims under both Title VII and 42 U.S.C. § 1981. Section 1981 ensures that certain rights, such as the right to make and enforce contracts, are enjoyed by all persons. 42 U.S.C.A. § 1981. Plaintiff "must satisfy the same elements to establish a prima facie case of racial discrimination under either Title VII or 42 U.S.C. § 1981." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 & n.1 (4th Cir. 2004); see also Mullen v. Princess Anne Volunteer Fire Co., 853 F.2d 1130, 1136 (4th Cir. 1988) (Burdine standard applicable to cases under Title VII and section 1981, where proof of discriminatory intent is required). The Fourth Circuit has noted that "[o]ur case law recognizes that 'the framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII or § 1981.'" Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (4th Cir. 1998) (quoting Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 910 (4th Cir. 1989)), vacated on other grounds, 527 U.S. 1031 (1999). In the present case, as in Lowery, the Court's discussion "regarding the Plaintiffs' Title VII claims encompasses [his] claims under § 1981." Id.

B.  Plaintiff's Claim of Discriminatory Discharge

To state a prima facie case of discriminatory discharge, Plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job at a level that met his employer's expectations at the time of discharge; and (4) the adverse employment action occurred under circumstances that support an inference of unlawful discrimination.  See Royster v. Costco Wholesale Corp., 378 F. Supp. 2d 595, 604 (M.D.N.C. 2005).

In this case, Defendant Widenhouse concedes that Plaintiff Gill can establish the first two elements of the prima facie case.  It argues, however, that Plaintiff cannot establish elements three and four.  Specifically, Defendant argues that because Plaintiff refused to perform his duties on June 9, 2008, he was not meeting its expectations at the time of discharge because he did not haul the loads as required.  (Def.'s Mem. [Doc. #25] at 6.)  However, in considering this contention, the Court notes that Manager Waller testified that under the company's health and wellness policy, a driver who felt nauseated and dizzy would need to come off the road.  (Waller Dep. at 198 [Doc. #26-8 at 13].)  Plaintiff has testified that he felt dizzy and nauseous on that day, which prevented him from safely operating his vehicle.  (Gill Dep. at 106-08 [Doc. #26-7 at 18-20].)  Moreover, Owner Barbour testified that drivers had become ill while working for Widenhouse and were allowed to come in off of the road.  (Barbour Dep. at 136-37 [Doc. #26-6 at 56-57].)  Although Manager Waller denies hearing anything about Plaintiff Gill being sick on June 9, Dispatcher Griffin testified that she heard Plaintiff tell Manager Waller that he was sick.  (Griffin Dep. at 155-57 [Doc. #26-12 at 11-12].)  In addition, Plaintiff testified that Manager

Waller may have told him to go back to Blythe Construction to run some loads, and that he responded by telling Manager Waller that he was not feeling well. (Gill Dep. at 113 [Doc. #26-7 at 25].) Plaintiff also testified that he left the facility and went to the doctor that same day, that he was given "breathing treatments," and that the doctor told him not to return to work until June 11. (Id. at 116 [Doc. #26-7 at 28].) In light of the company policies noted by Manager Waller and Owner Barbour, Plaintiff's failure to continue delivering loads after he became ill and dizzy would not reflect a failure to meet his employer's legitimate expectations.

Additionally with respect to whether Plaintiff was otherwise meeting his employer's legitimate expectations, Plaintiff testified that he had never been disciplined for poor performance at work. (Gill Dep. at 185-86 [Doc. #26-7 at 60-61].) In an effort to nevertheless establish that Plaintiff was not meeting expectations, Defendant prepared Plaintiff's purported attendance records for the EEOC investigation. (Records [Doc. #26-12] at 57-59.) These records show that on several days Plaintiff Gill refused to work. (Id.) However, Dispatcher Griffin testified that she created these records after Plaintiff was terminated in order to show a "pattern of laziness" on Plaintiff's part. The depositions of Manager Waller and Dispatcher Griffin show that many of the entries cannot be reconciled with Plaintiff Gill's payroll and other attendance records. (Griffin Dep. at 175-202 [Doc. #26-12 at 28-55].) Therefore, there are questions regarding the reliability of the records, as well as the circumstances surrounding the creation of those records. In the circumstances, the Court finds that Plaintiff has presented sufficient evidence to establish that he was meeting Defendant Widenhouse's legitimate employment expectations when he was discharged.

-12-

Case 1:11-cv-00498-WO-JEP   Document 51   Filed 12/19/12   Page 12 of 19

Defendant Widenhouse also contends that Plaintiff has not established the fourth element of the test, that his discharge occurred under circumstances that support an inference of unlawful discrimination. However, the deposition testimony of both Plaintiff and Dispatcher Griffin allows the conclusion that Manager Waller fired Plaintiff, and not Owner Barbour as Defendant now contends. In addition, the record contains considerable evidence that Manager Waller participated in or allowed many of the forms of racial harassment of which Plaintiff complains. There is also evidence that white employees were not fired even though one failed a drug test for which company policy required termination. (Waller Dep. at [Doc. #26-9] at 38; Griffin Dep. at 141-42, 146 [Doc. #26-12 at 4-5, 9].) A jury could infer unlawful discrimination based upon Plaintiff's termination in the circumstances and in light of the significant evidence of racial hostility and harassment. Therefore, Plaintiff Gill has established all of the elements of his prima facie case.

Because Plaintiff can establish the elements of his prima facie case, the burden shifts to Defendant Widenhouse to articulate a legitimate, non-discriminatory reason for firing Plaintiff. In this case, Defendant Widenhouse contends that it can establish a legitimate non-discriminatory reason for terminating Plaintiff's employment, based on his refusal to work on June 9, 2008, even if he was sick. Plaintiff contends that the reason proffered by Defendant is not its true reason, but is a pretext for discrimination. In this regard, as noted above, the evidence presented indicates that under Widenhouse policy, a driver who felt nauseated and dizzy would need to come off the road, and Owner Barbour testified that drivers had become ill while working for Widenhouse and were allowed to come off of the road. (Barbour Dep. at

-13-

136-37 [Doc. #26-6 at 56-57].) In addition, the evidence shows that Defendant believed in giving "second chances" to its white employees, including the employee who failed the random drug test but was not fired. (Waller Dep. [Doc. #26-9] at 38 (company drug policy stating that employees "with positive test results will immediately be terminated from employment"); Griffin Dep. at 142-43, 146 [Doc. #26-12 at 4-5, 9].)

In addition, as discussed above, there is evidence that Widenhouse created inaccurate attendance records to establish a basis for Defendant's termination. Similarly, Defendant has offered inconsistent versions of the circumstances surrounding Plaintiff's termination, specifically as to the identity of the decision-maker. In this regard, Defendant Widenhouse now contends that Owner Barbour was the sole decision-maker with respect to Plaintiff's termination, rather than Manager Waller. (Inter. Resp. [Doc. #26-6] at 63-64; Barbour Dep. at 114-15 [Doc. #26-6 at 39-40].) A determination that Owner Barbour rather than Manager Waller terminated Plaintiff's employment would work in Defendant's favor because of the extensive evidence of racial bias of Manager Waller. However, during the EEOC investigation, counsel for Defendant Widenhouse wrote a letter to the EEOC dated September 21, 2008, stating that Manager Waller told Plaintiff Gill to either haul the load or clean out his truck, without mention of any action by Owner Barbour.[5] (Barbour Dep. [Doc. #26-6] at 72.) Thus,

---

[5] Defendant Widenhouse has filed a Motion to Strike [Doc. #27], seeking to strike from the summary judgment record a July 29, 2008 letter [Doc. #38-1] from Defendant's counsel to Plaintiff Gill's counsel at the time. Defendant argues that the letter should be disregarded in its entirety pursuant to Fed. R. Evid. 408 because it was made for settlement purposes. Plaintiff Gill relies on this evidence for its contention that Manager Waller, rather than Owner Barbour, fired Plaintiff. However, the same information is set out in the September 21, 2008, letter from Defendant's counsel to Mr. Fulp of the EEOC, to which no objection is made. Therefore, the July 29 letter need not be considered in any event. In these circumstances, Defendant's Motion to Strike will be granted for purposes of this motion, and any further use or consideration of the July 29 letter may be considered

-14-

Plaintiff has presented evidence of inconsistencies by Defendant that can be considered in determining whether Defendant's proffered reason is pretextual. Cf. E.E.O.C. v. Sears Roebuck and Co., 243 F.3d 846, 852-53 (4th Cir. 2001) (noting that an employee may impeach an employer's proffered reason for the discharge if the company offers different and arguably inconsistent explanations for the dismissal of an employee); Reeves, 530 U.S. at 147 (noting that a fact-finder may be "entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt'"). After considering the evidence of record, a jury could determine that Defendant Widenhouse's proffered reason for terminating Plaintiff's employment was a pretext for racial discrimination.

Of course, Plaintiff bears the ultimate burden to prove discrimination, and in the context of a motion for summary judgment, Plaintiff must establish that a genuine issue of fact exists as to the ultimate question of whether Defendant Widenhouse intentionally discriminated against him. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005). Here, Plaintiff has impeached Defendant's proffered reason for his discharge as noted above, and has presented significant evidence of racial hostility and harassment. The Court concludes that Plaintiff has presented sufficient evidence from which a reasonable jury could conclude that his discharge was a result of racial discrimination.[6] Therefore, the Court will recommend that

---

at trial.

[6] The Court notes that Plaintiff has proceeded under the McDonnell Douglas burden-shifting scheme, and the Court has therefore analyzed his claims under that framework. However, the evidence of extensive racial hostility at Widenhouse could also be considered in determining whether Plaintiff has presented "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor" for the employment action. Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

Defendant's Motion for Summary Judgment as to Plaintiff Gill's claim of discriminatory discharge should be denied.

    C.    Plaintiff's Claim for Retaliatory Discharge

Plaintiff Gill also contends that his discharge was in retaliation for his complaints of racial discrimination. "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e–3(a)). To state a prima facie case of retaliation under Title VII, Plaintiff must establish that (1) he engaged in a protected activity; (2) Defendant took materially adverse action against him; and (3) a sufficient causal connection exists between the protected activity and Defendant's adverse action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011).

In this case, Defendant concedes that Plaintiff has produced sufficient evidence to establish the first and second elements of the prima facie case for retaliation. (Def.'s Mem. [Doc. #25] at 8.) Specifically, Plaintiff has presented evidence that he complained to his supervisor regarding racial harassment. Cf. Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) (noting that "protected activity" includes "opposition activity," which "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.") In addition, Plaintiff suffered a materially adverse action when he was discharged.

-16-

However, Defendant contends that Plaintiff cannot establish a causal connection between his discharge and the protected activity. In this regard, Defendant contends that Plaintiff Gill has not provided any evidence that Owner Barbour, whom it contends was the decision-maker, was aware of any of Plaintiff's racial discrimination complaints. However, as described above, there is a genuine issue of fact whether Owner Barbour or Manager Waller was the decision-maker. In addition, there is evidence in the record from which a jury could find that Manager Waller knew of Plaintiff's complaints. Plaintiff testified that on May 5, 2008, he complained to both Manager Waller and Dispatcher Griffin that he was tired of hearing "the N-word," but they were indifferent to his complaint. (Gill Dep. at 157-59 [Doc. #26-7 at 32-34].) The record contains a notation written by Dispatcher Griffin stating that Plaintiff "said he overheard drivers saying the 'N' word not directly to him." (Griffin Dep. [Doc. #26-12] at 56.) Dispatcher Griffin testified that she did not remember writing the note and did not remember what she did with it after she wrote it, "unless I give [sic] it to Buddy [Waller] and it was put in his file." (Id. at 95 [Doc. #26-12 at 3].)

Defendant also contends that "temporal proximity alone is insufficient to prevail on a retaliation claim." However, the evidence would support a conclusion that Plaintiff Gill complained to Manager Waller about racial harassment at the workplace on May 5, 2008, about four weeks prior to the day Plaintiff's employment was terminated on June 9. Such close temporal proximity between the complaint and the materially adverse action supports a finding that the two were connected. See Lettieri v Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007). Moreover, the evidence set forth above of the racially discriminatory attitudes toward African

-17-

Americans at Widenhouse "would allow a trier of fact to conclude that these discriminatory attitudes led to [Plaintiff's] ultimate termination." Id. at 649. Therefore, Plaintiff has presented sufficient evidence to establish a prima facie case of retaliation.

As with the discriminatory discharge claim, the burden then shifts to Defendant to articulate a legitimate, non-retaliatory reason for the action. As discussed above, Defendant submits that Plaintiff was discharged for refusing to work. However, for all of the reasons set out above, Plaintiff has presented evidence to impeach that proffered reason, and has also presented evidence of racial discrimination and hostility. This evidence would also include evidence of Defendant's indifference to Plaintiff's concerns and failure to correct those engaging in racial harassment even after Plaintiff's complaints. The Court concludes that the evidence presented would allow a reasonable jury to conclude that Plaintiff's discharge was in retaliation for his efforts to oppose racial discrimination at Widenhouse. Therefore, the Court will recommend that Defendant's Motion for Summary Judgment as to Plaintiff Gill's claim of discriminatory discharge and retaliation be denied.

    D.    State Law Wrongful Discharge Claims

Finally, as to Plaintiff Gill's claim for wrongful discharge in violation of public policy under state law, Defendant seeks dismissal of that claim as barred by the statute of limitations. In Response, Plaintiff Gill notes that he "does not intend to advance this claim as the applicable state statute of limitations has expired." (Pl.'s Br. [Doc. #26] at 1 n.1.) Therefore, Defendant's Motion for Summary Judgment should be granted with respect to that state law claim.

-18-

Case 1:11-cv-00498-WO-JEP   Document 51   Filed 12/19/12   Page 18 of 19

III. CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment [Doc. #24] be granted as to Plaintiff Gill's state law claim of wrongful discharge, but otherwise be denied.

IT IS ORDERED that Defendant's Motion to Strike [Doc. #27] is GRANTED without prejudice to the decision being reconsidered to the extent it pertains to evidence admissible at trial.

This, the 19th day of December, 2012.

                                              /s/ Joi Elizabeth Peake
                                              United States Magistrate Judge